## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

HERITAGE ROYALTY OIL & GAS, LLC, on
behalf of itself and all others similarly situated,

     Plaintiff,

v.

                              Civil Action No. 20-3753

FOUNDATION ENERGY MANAGEMENT, LLC
(including affiliated predecessors & successors),

     Defendants.

## CLASS ACTION COMPLAINT

     Heritage Royalty Oil & Gas, LLC ("Heritage" or "Plaintiff"), on behalf of itself and all others similarly situated (the "Class"), files this Class Action Complaint against Foundation Energy Management, LLC, and its affiliated predecessors and affiliated successors, ("Foundation Energy" or "Defendant"), and alleges and states as follows:

## SUMMARY OF ACTION

     1.    Plaintiff and the Class bring claims against Foundation Energy concerning its actual, knowing, and willful underpayment or non-payment of royalties on oil and gas production through improper accounting methods, such as: (a) not paying royalty on all of the constituents produced from the gas stream; (b) not calculating royalty on the gross starting market price at which the gas products were sold; and, (c) by deducting or allowing

the deduction of certain midstream service costs, both monetary and in-kind, from royalty when the leases do not expressly allow such deductions, all as more fully described below. For these unlawful acts by Foundation Energy, Plaintiff and the Class seek actual damages and all other damages provided by law, including punitive damages under Oklahoma statute.

## PARTIES

2.      Plaintiff Heritage Royalty Oil & Gas, LLC is a limited liability company organized under the laws of Colorado. Heritage owns royalty interests in wells located in Oklahoma and elsewhere. Its business headquarters is located at 755 El Pomar Rd., Unit III, Colorado Springs, Colorado 80906. Defendant pays royalty to Heritage on the Albert 2-10 well.

3.      Defendant Foundation Energy Management, LLC is a limited liability company, organized under the laws of the state of Texas, with its headquarters in Addison, Texas. It is registered to do business in the State of Colorado and maintains a corporate office and principal place of business at 1775 Sherman Street, #1800, Denver, Colorado 80203. It may be served with process through its registered agent, CT Corporation System, 7700 Arapahoe Rd., Suite 220, Centennial, Colorado 80112.

4.      The acts charged in this complaint as having been done by Foundation Energy were authorized, ordered, or done by officers, agents, affiliates, employees, or representatives, while actively engaged in the conduct or management of Foundation

Energy's business or affairs, and within the scope of their employment or agency with Foundation Energy.

## JURISDICTION AND VENUE

5.  This Court has original subject matter jurisdiction over the claims asserted in this complaint under 28 U.S.C. § 1332(d), because the proposed class has more than 100 members, the parties are minimally diverse, and the amount in controversy exceeds $5 million.

6.  This Court has jurisdiction over Foundation Energy because it regularly transacts business within this State, is registered to do business in this State, and maintains a corporate office and principal place of business within this judicial district. It also regularly paid or pays royalties on oil and gas produced in this State and others to residents in this State. Specific to Plaintiff, Foundation Energy regularly mails royalty checks and itemized royalty statements to Plaintiff at Plaintiff's business address in Colorado Springs, Colorado.

7.  Venue in this judicial district is proper under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred here.

## FACTUAL ALLEGATIONS

8.  Defendant Foundation Energy markets the gas produced and pays royalty to Plaintiff on the gas produced from wells under at least one oil and gas lease. Defendant has a copy of the lease that is attached as **Exhibit 1** and more fully described below.

9.     Plaintiff's oil and gas lease expressly requires payment of royalty on: (a) gas "with all of its constituents"; (b) gas "sold or used off the leased premises, or used in the manufacture of products therefrom,"[1] and (c) the "gross proceeds received for the gas sold, used off the premises, or in the manufacture of products therefrom." This lease has the following royalty clause:

> 2nd. To pay lessor for gas of whatsoever nature or kind (with all of its constituents) produced and sold or used off the leased premises, or used in the manufacture of products therefrom, one-eighth (1/8) of the gross proceeds received for the gas sold, used off the premises, or in the manufacture of products therefrom, but in no event more than one-eighth (1/8) of the actual amount received by the lessee, said payments to be made monthly.[2]

In addition, this lease contains the Implied Duty to Market and its corollary the Marketable Condition Rule because the lease contains no language spelling out any authority of the lessee to deduct any midstream service costs from royalty.

10.     This case focuses on underpayment of royalties for gas by Defendant's failure to pay for: (a) "all constituents" [which includes residue (almost all methane), ethane, propane, butane (both iso-butane and normal butane), pentane plus, drip condensate, helium, and/or nitrogen] produced in the unprocessed gas stream; (b) the full value of the above-named gas products because Defendant deducts monetary and in-kind midstream services costs for Gathering, Compression, Dehydration, Treatment, and

---

[1]  An express lease provision stating that royalty is to be paid on gas used off the leased premises is referred to in this complaint as an "Off-Lease Use Clause."

[2]  The lease also states: "Any reference to 1/8 royalty is hereby amended to 3/16 royalty."

Processing ("GCDTP"); and, (c) the value of gas taken from the wells and used either off

the lease to power the equipment that performs compression, dehydration, treatment, or

processing services, or to pay in-kind for off-lease services by allowing the midstream

service provider to keep all or part of the gas or its constituents for later sale on its own

account ("Off-Lease Use Gas").[3]

11.     The lease forms in this case will fit into two general buckets: Express Leases

or Silent Implied Duty to Market Leases ("Silent IDM Leases").

12.     The Express Leases also fall into two categories: (a) Express Deduction

Leases ("ED Leases"), which, by their express terms, authorize Defendant to pay royalties

by: (i) deducting midstream services costs; (ii) not paying royalty on Off-Lease Use Gas;

or (iii) not paying royalty for all constituents—these ED Leases are *excluded* from the

Class;[4] and (b) Express No Deduction Leases ("END Leases"), which expressly prohibit

Defendant from underpaying royalty in one or more of the three ways indicated in

Paragraph 10 above.

---

[3] The claims here involve only gas and off-lease use of gas. The claims do not concern oil
or on-lease use of gas, which the leases allow for the lessee's operations on the leased
premises. Nor do the claims concern underpayment of royalties for irrigation gas sales to
farmers or ranchers, which also occur on-lease for the operation of equipment designed to
run on unprocessed gas.

[4] An ED Lease may be partial. For instance, it may allow deductions for only some of the
midstream services costs, such as for GCDT but not for P. For purposes of this case only,
a partial ED Lease, which spells out authority in the lessee to deduct any one or more of
the GCDTP services from royalty, will be conservatively treated as a full ED Lease and
excluded from the Class.

13.     The Silent IDM Leases contain the Implied Duty to Market, which requires Defendant to pay royalty on all constituents produced, on all Off-Lease Use Gas, and on the full proceeds or value of the gas produced from the Class Wells. The Silent Leases for gas—gas that is intended for the high pressure, transmission pipeline market—prohibit Defendant's underpayments of royalties.

14.     The Implied Duty to Market has three components, any of which may be breached: (a) the duty of the lessee (Defendant here) to get the best reasonable price for each gas product—which would be breached if the lessee tried to make a pre-market sale for less than full market value or if the lessee deducted midstream services costs from royalty or bartered away gas products without paying any royalty on those constituents; (b) the duty of the lessee to market gas products for the mutual benefit of the lessee and the lessors (royalty owners)—which would be breached if the lessee manipulated its midstream gas contracts to shift midstream services costs to the lessors' royalty interests or to barter away gas products to pay for midstream services that royalty owners are not to bear under the law; and (c) the duty to transform the raw gas into marketable products for sale into the markets for those products—which would be breached by the lessee not bearing all the midstream service costs inherent to this duty.

15.     All the "Class Leases" will be END or Silent IDM Leases.

16.     Defendant wrongfully deducted the midstream services costs from oil and gas royalty owners, such as Plaintiff, from Oklahoma, Colorado, and Wyoming wells.

17.    Defendant sent periodic royalty statements to Plaintiff and the Class that (a) falsely represented Defendant was paying royalty on the gross volume and/or gross value of the gas produced when, in fact, it was paying on the net volume and/or net value reduced by improper monetary and/or kinds fees; and (b) did not detail the deductions improperly taken from royalty payments. Defendant thereby precluded Plaintiff and the Class from discovering or uncovering the scheme by commission and omission. Defendant purposefully chose not to list the itemized deductions to conceal and prolong the scheme.

18.    As royalty owners are not parties to and are not even allowed to see the contracts between Defendant and the midstream companies who provide the services for which the monetary or in-kind fees are incurred, Plaintiff and the Class rely on the royalty statements to accurately reflect the volumes and values of all gas taken (except for gas Defendant used on the leased premises ("on-lease")).

19.    Plaintiff and the Class all relied on the royalty statements to their detriment. They had no ability to detect the scheme Defendant was perpetuating on them, and their money was paid out of the revenue Defendant earned, so Plaintiff and the Class had no ability to control or stop the scheme from occurring. Here, Defendant controlled all the information, all the contracts, all the revenue, and all the proceeds—literally, everything.

20.    In return for the right to extract oil and gas, the lease agreements promise a royalty to the lessors based on the amount Defendant received for all gas products, the full value of the gas products, and the full value of Off-Lease Use Gas.

21.    Prior to filing this lawsuit, Plaintiff requested from Defendant under Oklahoma's Production Revenue Standards Act[5] certain information for all royalty payments on gas produced from wells under Plaintiff's oil and gas lease, including "a specific listing of the amount and purpose of all … deductions." Okla. Stat. tit. 52, § 570.12. As of the filing of this complaint, Defendant has failed and refused to provide Plaintiff with the requested information.

## GAS INDUSTRY BACKGROUND

22.    Plaintiff and the members of the Class own royalty interests in wells that produce gas and gas constituents that are transformed into marketable products and sold into the established commercial markets for those products.

23.    The Class Leases expressly or impliedly require Defendant to pay royalty on all constituents produced from the gas taken from the wells, *i.e.*, all constituents in the gas stream. But Defendant pays royalty only on some of the gas products sold and not on others. Instead, without paying royalties, Defendant gave away, in whole or in part, as in-kind consideration for midstream services, drip condensate, Off-Lease Use Gas in midstream facilities, or retainage at a processing plant.

24.    The Class Leases expressly or impliedly require Defendant to pay royalty on the full volume of gas produced, including Off-Lease Use Gas, but Defendant did not do so. Instead, Defendant did not pay royalty on gas it gave away, in whole or in part, as in-

---

[5] Okla. Stat. tit. 52, § 570.1 *et seq.*

kind consideration for midstream services, drip condensate, Off-Lease Use Gas in midstream facilities, or retainage at a processing plant.

25.     The Class Leases expressly or impliedly require Defendant to pay royalty on the full value of gas products without deducting midstream GCDTP services costs (monetary or in-kind fees), but Defendant did not do so. Instead, without paying royalties, Defendant gave away, in whole or in part, as in-kind consideration for midstream services, drip condensate, Off-Lease Use Gas in midstream facilities, or retainage at a processing plant and deducted monetary fees for GCDTP that were not authorized by law (except for Processing in Wyoming).

### The Lessor-Lessee Relationship

26.     The lessor owns minerals, including oil and gas; the lessee has the money, labor, and know-how to extract, condition, and market those minerals. The lessor and lessee sign a lease that allows the lessee to take the minerals from the lessor's land. In the past, the usual revenue split from a well was 1/8th to the lessor (royalty owner) and 7/8ths to the lessee. As the risk of finding oil and gas has diminished over time, due to the prevalence of wells delineating the field, better seismic technology, and increased efficiency of drilling rigs, royalty owners have more recently received 3/16th, such as Plaintiff here, or even 1/4th of the revenue from the valuable gas products.

27.     But Defendant has used undisclosed internal accounting practices to try to keep for itself as much of the well revenue as possible. These accounting practices are at

the heart of this oil and gas royalty case.

28.    Rather than adopting transparency in its royalty calculation formula, Defendant has guarded its production and accounting processes as confidential or proprietary, thereby depriving the royalty owners of information necessary to understand how the lessee calculates royalties. Consequently, the royalty owner is unaware of the lessee's actual practices, thereby enabling Defendant to breach the oil and gas lease without accountability.

29.    Defendant does not disclose in any respect the amount or volume of in-kind gas for which royalty is owed. Indeed, the uniform royalty statements used by Defendant throughout the country provide no indication that gas is being used in-kind off the lease and not being paid for. The underpayment for monetary fees is also opaque.

30.    If and when one or more royalty owners learn of these "breaches," the royalty owner has only three—all poor—options: (1) confront the lessee and maybe get paid while the lessee continues to retain improperly garnered gas revenues from thousands of other unknowing royalty owners; (2) do nothing since the "breaches" only result in a modest yearly loss and the expense of individual litigation would exceed the recovery, if any; or (3) file a class action lawsuit which will persist for years and probably will not recover the full loss. In short, if the lessee breaches, it may never be held accountable; and if a royalty owner complains, the lessee will still come out ahead because an individual case is not worth much and a class action rarely requires 100% repayment to royalty owners plus-

prejudgment interest, plus attorneys' fees and expenses. The class action is the best of the three options, hence the filing of this class action lawsuit.

### Residue Gas, Helium, Nitrogen, and Natural Gas Liquids Production

31.    The Class Gas is gathered from each well, dehydrated and compressed, through underground gathering lines crossing many miles of land to processing plants where the raw gas is transformed into two primary products—methane (also called "residue gas") and fractionated natural gas liquids ("NGLs"). Once homogenized as fungible products, the residue gas and NGLs are sold in the commercial market.

### Wellhead (Basic Separation and Gas Measurement)

32.    This diagram[6] illustrates the typical on-lease gas separating process.



---

[6] *See* http://www.kgs.ku.edu/Publications/Oil/primer13.html

33.     Wells produce oil, gas, and a host of other products, such as water, helium, nitrogen, etc., all mixed together in the gas stream.[7] After the stream comes out of the ground, it enters the free water knockout (a/k/a three-phase separator) that separates the products by gravity, water at the bottom, oil in the middle, and gas going out the top. Due to the low technology, the separator is not expensive. The gaseous mixture (with helium, nitrogen, NGLs, and other gaseous substances) passes from the separator into the gas line.[8] The remaining fluid goes through the heater-treater where heat, gravity segregation, chemical additives, and electric current break down the mixture more clearly in oil and water. The heater-treater is installed, maintained, and takes fuel to operate. The water is drained off and sent for saltwater disposal. The oil that is separated at the wellhead is collected in a tank, then usually trucked out and sold (the payment of oil royalties is not at issue in this lawsuit).

34.     Because production over time depletes the pressure of a well, on-lease compressors are occasionally installed to suction gas out of the well or to move the gaseous

---

[7] Hydrocarbons can vary in chemical makeup (from simple methane to complex octane) and in form (from pure gaseous state to liquid condensate). The non-hydrocarbon makeup of the well-stream that includes natural gas can also include gases such as helium, sulfur, carbon dioxide, and nitrogen. This mixture of many gaseous elements and substances is often referred to as the "gas stream" or just "gas."

[8] A minute portion of this raw gas may be used on a few leased lands to heat the farmhouse pursuant to a free gas clause in the lease. Although title to the gas sometimes is purportedly transferred, this is not a true sale. Some producers sell less than 3% of the raw gas to a local irrigator during the summer months for agricultural purposes, but this is not the economic market for which the wells are drilled.

mixture down the gathering lines. When these compressors are installed, their use requires fuel.

35.    The operator of the well can choose to perform all the necessary midstream services on-lease by installing an on-lease compressor, dehydrator, treater, and even processor (known as a JT-Unit). If it does, the oil and gas lease usually expressly authorizes the use of on-lease gas without paying royalty. Industry custom also dictates that costs of operating on-lease facilities are *not* deducted from royalties, but, due to efficiencies and economies of scale, operators usually perform, or hire others to perform, the midstream GCDTP services to a large, commingled gas stream from many wells.

36.    The operator is entitled to make that choice of whether to perform needed services on-lease or off-lease, but choosing to perform the services off-lease does not magically convert the costs of those services into costs chargeable to royalty owners. In this case, Plaintiff and the Class do not complain about any royalty underpayments based on on-lease activities.

37.    This case does not involve the underpayment of royalties based on anything that happens on-lease because none of the gas in this case is intended for the minute, local irrigation market and none of the royalty deductions or non-payments occur on-lease, they are all in the off-lease, midstream service area where the gas is serviced by hired service providers to transform the raw gas into marketable methane, ethane, propane, butane,

pentane plus, drip condensate, and in the Oklahoma Panhandle and parts of Wyoming,

helium and liquid nitrogen.

**Midstream Services: Gathering, Compression, Dehydration,
Treatment, Processing (GCDTP) followed by Downstream Market Sales**



38.     As the gaseous mixture from each well enters the gathering line, it flows into

a meter run where the mixture is measured (usually by the midstream gatherer) for both

volume (in Mcf) and quality (Btu content) (combined, "gas measurement," in MMBtu).

The gas measurement does not determine market volume, market quality, or market price.

Instead, the gatherer uses the gas measurement to allocate the ultimate downstream market

values obtained for all of the commingled gas products *minus* the midstream gas service

costs (netback value) back to each well. This netback value is then paid to working interest

owners in each well who account to their royalty owners. ED Leases expressly authorize the payment of royalty on this netback value, i.e., gross proceeds, price, or value minus or less midstream services costs, which is why royalty owners paid under ED Leases are excluded from the Class.

39.    Gas will not move downstream from the well unless it is pressurized sufficiently to overcome the in-line back pressure and friction in the gathering line. So large gas compressors are installed to move the gas from the gathering line inlet to the processing plant. Usually a series of compressors are necessary to build enough pressure for the commingled gas to enter the high, pressure transmission line at the market at the Interstate Pipeline Inlet, where the sale of residue gas occurs. These compressors are expensive and require fuel to operate, meaning the commingled gas stream incurs a compression cost (C).

40.    Gathering pipelines are usually made of metal that can be corroded by water vapor (and other corrosive gases) in the gaseous mixture, so a glycol dehydrator is used to remove the water vapor. This results in a dehydration cost (D) for the commingled gas on the gathering system.

41.    The gathering pipelines themselves cost money to lay and maintain, though most have been in place for decades. Gas condensate (gas condensed into liquid as it cools and is pressurized) ("Drip Condensate") is collected at points along the gathering lines as a result of cleaning or "pigging the line" and is captured for fractionation and sale later.

Upon information and belief, Defendant pays no royalty on the revenue generated from the sale of the drip condensate.

42.    Finally, gathering lines leak, especially as they age, resulting in lost and unaccounted for gas ("L&U"). Defendant pays no royalty on the volume of L&U.

## Natural Gas Processing

43.    Once enough of the gas mixture from multiple wells (and often from multiple gathering systems) is gathered, the mixture enters the inlet of the processing plant where the mixture will be transformed into methane and mixed NGLs.

44.    Lessees, such as Defendant, use gas processing plants either owned by them or a third party. Usually an unrelated third party owns the processing plant, but the plant may also be owned in whole or in part by a lessee.

45.    The plant removes impurities that remain in the mixture, such as carbon dioxide, nitrogen, or sulfur, before the mixture can be processed. This incurs a "treatment cost" (T) for the commingled gas mixture.

46.    The final cost, processing (P), involves services to transform the gas mixture into methane gas (or residue gas); raw make NGLs into purity products (ethane, propane, iso-butane, normal butane, and pentane plus); and in the Panhandle of Oklahoma and parts of Wyoming, crude helium and liquid nitrogen.

a.    To separate the NGLs from the gaseous mixture, the mixture is cooled to temperatures lower than minus 150°F (the "Cryogenic or cooling

16

process"). The leftover residue gas must meet the tariff quality standards for long-haul, high pressure pipeline transmission set by the Federal Energy Regulatory Commission ("FERC"), which is called "pipeline quality gas." The gas must meet all the required pipeline tariff qualities simultaneously.

b.    The raw make NGLs is gathered from multiple gas processing plants and commingled for further processing at NGL processing plants, which are called fractionators because they fractionate the mixed NGLs into separate purity products that can meet Oil Price Information Service ("OPIS") specifications for market sales. The purity products are used as a feedstock in the petrochemical and oil refining industries; they are a more valuable commodity than methane. In the gas contracts, this fractionation process incurs a "T&F" or "fractionation" fee, even though lessees sometimes give away some or all the NGLs as consideration for processing services.

c.    Crude helium (contaminated with nitrogen) is processed into Grade A helium at some processing plants, like the ExxonMobil Shute Creek Plant in Wyoming, or at a nearby helium processor like the National Helium Plant in Kansas that receives gas from the Oklahoma Panhandle.

47.    This total processing system involves expensive equipment and requires fuel to operate (collectively, the "processing charge" and/or "plant fuel"). Defendant does not pay royalty on plant fuel, even though it comes from Class Wells.

48.    At the tailgate of the gas processing plant, at least two products emerge: (1) residue gas (or methane gas) and (2) NGLs (usually a mixture of NGLs, known as "raw make" or "Y" grade). In helium-rich production areas, Grade A or crude helium, along with liquefied nitrogen also emerges. But none of these products are commercially marketable at that point.

## Marketable Condition for the Products

49.    *Methane Gas*. Methane gas (or residue gas) is commercial quality (or pipeline quality) at the tailgate of the processing plant only after it is further pressurized to enter the transmission line by a booster compressor (the "booster compression" cost).

50.    *NGLs*. The raw mixture of NGLs at the tailgate of the processing plant is not commercially marketable. It must be fractionated into commercially marketable products (ethane, propane, butane, isobutene, natural gasoline, etc.).

51.    *Drip Condensate*. Drip Condensate is recovered on the gathering lines and at the inlet to the processing plant and is essentially in marketable condition when collected.

52.    *Other Products*. In some areas of the country (e.g., in the Hugoton Field, which stretches across Southwest Kansas, the Oklahoma Panhandle, the Texas Panhandle, and in parts of Wyoming), helium is produced in commercial quantities and recovered,

along with liquid nitrogen. When such products are available in commercial quantities, processing and treatment plants recover these valuable constituents but lessees, such as Defendant, pay little or nothing to the royalty owners. Royalty owners should be paid for the gas and all constituents taken.

### Sale of Products

53.    To turn the marketable products into money, the producer sells them (or contracts to have them sold) in the commercial marketplace in an arm's length transaction. No money exchanges hands until the residue gas is sold at the Index pool, the fractionated NGLs at OPIS, and any other marketable products at the prices established by their respective commercial markets. In other words, payment to Defendant is delayed until after the gas is processed into marketable form and sold as marketable products.

54.    The "starting price" for gas products is always achieved, as it must be, at a commercial market price. All of the gas contracts express the commercial market price in one of two ways: (a) a market price, called an "Index" price for residue gas and "OPIS" price for fractionated NGLs, or (b) a "weighted average sales price" or "WASP" achieved at the same residue Index market or OPIS market. The difference stems from the producer's, such as Defendant here, market power to, over time, obtain an above Index or OPIS price in its arm's length sale. Whichever starting price is used in an arm's length transaction, that price is the highest and best reasonable price for the valuable gas products. If other products are also produced, they are and must be priced in a commercial market.

55.    Fictitious "sales" (also known as sham sales or conditional sales) are created by lessees to try to pass off a non-commercial market sale as if it should be the starting point for royalty payments. But none of these efforts comport with economic reality or are in good faith with respect to royalty owners. For instance:

a.    Anything of value can be sold at any place and in any condition. For gas that means anywhere from downhole to the interstate pipeline, but that does not make the sale in a commercial market.

b.    The lessee could simply pay for all the midstream services with monetary fees or in-kind contributions of all or part of the valuable constituents. But the structure of the transaction does not change the fact that the services are necessary to prepare the gas and valuable constituents for the first real sale into the commercial market—Index or OPIS.

c.    Nor does a contract saying title transfers at a custody transfer point create a sale of marketable products in a real commercial market. Some gas contracts with midstream companies that provide GCDTP services purport to do that, but other parts of the gas contract demonstrate that it is a poorly attempted legal sleight of hand as (i) the risk of loss that usually passes with a true title transfer and market sale does not happen; (ii) the cost of future downstream services that

usually passes with a true title transfer and market sale does not happen; (iii) the starting price that would occur with a true title transfer and market sale does not happen. Indeed, the paper title transfer is unnecessary to receiving the midstream services as the gas could (and sometimes does) receive the exact same midstream services without the paper title transfer.

d.      All the gas contracts implicitly recognize this paper title transfer fiction, as the starting price for gas products always is at the Index and OPIS market pool as previously described.

e.      Midstream services providers are not buyers and resellers of raw gas. They are service providers that convert raw gas into pipeline quality gas so it can enter the Index or OPIS market pools. Indeed, they are called midstream servicers, not midstream purchasers.

**The Many Different Ways Defendant Underpays Royalty Owners**

56.      The extraordinarily large dollars at stake and the one-sided nature of the gas lessor-lessee relationship constantly tempt lessees to wrongfully retain gas revenues. All payment formulas, all affiliate and non-affiliate contractual relationships, and all calculations are firmly kept in the exclusive control of lessees, *and* they involve undisclosed accounting and operational practices. As a result, there are many ways that royalty owners are underpaid on their royalty interests, and they never know it. The

common thread through all these schemes is that they are typically buried in the internal lessee accounting systems or royalty-payment formulas.

57.    Defendant represents the royalty calculation in the form of a periodic royalty statement it sends each royalty owner. The royalty statement shows each royalty owner's interest and taxes (which are not in dispute here), and volume, price, deductions, and value, all of which are disputed here—and all of which are falsely represented on the royalty statement.

58.    Defendant underpays royalty to Plaintiff and the other members of the Class in one or more of the following ways:

  a.    *Residue Gas*. The starting price paid for residue gas should be an arm's length, third party market sales price for residue gas at pipeline quality. All of Defendant's gas contracts will show this to be true. But instead of paying on that gross competitive price, Defendant pays on a net price after directly taking or allowing midstream companies to indirectly take midstream services deductions (both monetary fees and in-kind volumetric deductions).

  b.    *NGLs*. The starting price paid for fractionated NGLs should be an arm's length, third party market sales price for ethane, propane, normal butane, iso-butane, and pentane plus (a/k/a natural gasoline). All of Defendant's gas contracts will show this to be true. But instead

of paying on that gross competitive price, Defendant does not pay for fractionated NGLs at all.

c.   *Drip Condensate*. Plaintiff and Class Members' wells produce heavy hydrocarbons that condense in the pipeline. Defendant, or a third-party on behalf of Defendant (gatherers and/or processors), recovers those hydrocarbons for sale. Defendant fails to pay any royalty for that Drip Condensate.

d.   *Other Products*. Helium is contained in the well-stream produced from Plaintiff's and many Class Members' wells, but Defendant does not pay any royalty at all for helium or liquid nitrogen taken from Plaintiff's and the Class's wells.

e.   *Off Lease Use Gas Volumes.* Defendant pays no royalty on Off-Lease Use Gas even where the Class Leases contain express Off-Lease Use Clauses.

## CLASS ACTION ALLEGATIONS

59.   Plaintiff brings this action, pursuant to Federal Rule 23(a) and (b)(3), as representatives and on behalf of the following multi-state class (the "Class"):

**CLASS:** All last successors in interest to royalty owners in Colorado, Oklahoma, and Wyoming wells where Foundation Energy Management, L.L.C. (including its affiliated predecessors and affiliated successors) marketed the gas and directly paid royalties to the royalty owners under any lease from January 1, 2014 to the date when Class Notice is given. These Class claims relate to royalty payments for gas and its constituents (such as

residue gas, ethane, propane, butane, pentane plus, helium, nitrogen, or drip condensate).

Excluded from the Class are: (1) agencies, departments or instrumentalities of the United States of America, including but not limited to the U.S. Department of the Interior (the United States, Indian tribes, and Indian allottees); (2) Defendants, their affiliates, predecessors, and employees, officers, and directors; (3) any publicly traded entity (and its affiliates) that produces, gathers, processes, or markets gas; (4) the claims of royalty owners to the extent covered by arbitration clauses or prior settlement agreements, if any, still in effect on the date this lawsuit was filed; (5) royalty paid by Defendant only as a pass-through for other non-affiliated entities; and, (6) royalty owners under Express Deduction Leases.

60.    The members of the Class are so numerous that joinder of all members is impracticable.

61.    Defendant markets or has marketed gas from thousands of Class Wells that produce gas. Defendant holds a working interest in these wells, with at least one, and usually multiple, royalty owners for each well.

62.    Defendant has within its possession or control records that identify all persons to whom it (including affiliated predecessors and those for whom they are legally responsible) have paid royalties from Class Wells during the Class Period.

63.    The questions of fact or law common to Plaintiff and the Class include, without limitation, one or more of the following:

    a.    <u>Duty</u>: Whether all members of the Class are owed the duty of full payment?[9]

    b.    <u>Breach</u>:

        i.    Whether the Class gas was intended for the high pressure, transmission line market?

        ii.    Whether the Class gas, before it was commingled on the gathering line, needed one or more of the midstream GCDTP services to meet the high pressure, transmission line market specifications?

    c.    <u>Damages</u>:  Can class-wide damages be calculated?

64.    Plaintiff is typical of other members of the Class because Defendant paid royalty to Plaintiff and other members of the Class using a common method that did not utilize full payment for gas products. Instead, Defendant paid royalty based on the full gas revenue minus what Defendant contractually obligated itself to pay for midstream GCDTP services under its gas contracts, which terms royalty owners do not know or approve. The contracts are for services necessary to place the commingled gas and its constituent parts into marketable condition, so the gas products can be sold into recognized, active, and

---

[9]  Plaintiff recognizes that Wyoming law may allow processing deductions by statute, but all other GCDT deductions are not allowed under such leases.

competitive commercial markets. The gas contracts also barter away Off-Lease Use Gas in exchange for midstream services.

65.     Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is a royalty owner to whom Defendant paid royalty. Plaintiff understands its duties as Class representative. Plaintiff has retained counsel competent and experienced in class action and royalty owner litigation.

66.     This action is properly maintainable as a class action. Common questions of law or fact exist as to all members of the Class, and those common questions predominate over any individualized questions that would require evidence from each individual class member. *See ¶* 62, above. There is no need for individual class members to testify in order to establish Defendant's liability to or damages sustained by Plaintiff and members of the Class.

67.     Class action treatment is appropriate in this matter and is superior to the alternative of numerous individual lawsuits by members of the Class. Class action treatment will allow many similarly situated individuals to prosecute their common claims in a single forum, simultaneously, efficiently, and without duplication of time, expense, and effort on the part of those individuals, witnesses, the courts, and/or Defendant. Likewise, class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as

a class action and no superior alternative forum exists for the fair and efficient adjudication of the claims of all members of the Class.

68.    The amounts at stake for individual class members, while significant in the aggregate, would be insufficient to enable them to retain competent legal counsel to pursue claims individually. In the absence of a class action in this matter, Defendant will likely retain the benefit of its wrongdoing.

**COUNT I**
**BREACH OF LEASE**
**(including implied duties)**

69.    The allegations set forth in all other paragraphs of this complaint are incorporated herein by reference.

70.    Plaintiff and the other members of the Class entered into written, fully executed oil and gas leases with Defendant or its predecessors. Those leases include implied covenants requiring Defendant to prepare the gas and its constituent parts for market at Defendant's sole cost. The leases with express Off-Lease Use Clauses and those silent on the subject, further obligated Defendant to pay royalty on all Off-Lease Use Gas, which they did not do. The leases also place upon Defendant the obligation to properly account for and pay royalty interests to royalty owners under the mutual benefit rule and good faith and fair dealing.

71.    At all material times, Plaintiff and the members of the Class have performed the terms and obligations under the Class Leases.

72.     Defendant breached the Class Leases, including the implied covenants, by its actions and/or inactions in underpaying royalty or not paying royalty on all products sold from the gas stream and all products used off the leased premises.

73.     As a result of Defendant's breaches, Plaintiff and the members of the Class have been damaged through underpayment of the actual amounts due.

74.     Plaintiff and the members of the Class in Oklahoma wells are entitled to other damages provided by Oklahoma statute, including compounding interest and punitive damages. *See* Okla. Stat. tit. 52, § 570.1, *et seq.*

75.     Plaintiff and the members of the Class in Oklahoma wells are entitled to punitive damages under Okla. Stat. tit. 52, § 903, which provides that punitive damages may be recovered upon "a determination by the finder of fact upon clear and convincing evidence that the holder who failed to pay such proceeds did so with the actual, knowing and willful intent:. . . (b) to deprive proceeds from the person the holder knows, or is aware, is legally entitled thereto."

76.     Defendant has deprived proceeds from Plaintiff and the members of the Class to whom Defendant knows proceeds are owed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the members of the Class seek:

a.      An order certifying and allowing this case to proceed as a class action with Plaintiff as class representative for the Class and the undersigned as class counsel;

b.      An order requiring Defendant to pay Plaintiff and all class members' actual damages to fully compensate them for losses sustained as a direct, proximate, and/or producing cause of Defendant's breaches;

c.      An order awarding punitive damages as determined by the jury and in accordance with Oklahoma law on each of Defendant's wrongful acts, as alleged in this complaint;

d.      An order awarding pre- and post-judgment interest at the highest allowable rate;

e.      An ordering requiring Defendant to pay Plaintiff and the Class's costs, attorneys' fees, and litigation expenses out of the recovery; and

f.      Such other relief as this Court may deem just, equitable, and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff requests a jury trial on all matters so triable.

Respectfully Submitted,

*/s/ Rex Sharp*
REX A. SHARP CO 017389
SHARP LAW, LLP
5301 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 fax
rsharp@midwest-law.com

BARBARA C. FRANKLAND CO 54469
SHARP LAW, LLP
11990 Grant Street, Suite 550
Northglenn, CO 80233
(720) 932-0700
(720) 932-0700 fax
bfrankland@midwest-law.com

*Attorneys for Plaintiff Heritage
Royalty Oil & Gas, LLC, on
behalf of itself and all others
similarly situated*